2009 ME 17

**ESTATE OF George L. FOURNIER.**

Supreme Judicial Court of Maine.

Argued: Sept. 15, 2008.

Decided: Feb. 24, 2009.

Daniel E. Wathen, Esq., Catherine R. Connors, Esq. (orally), Hallie Flint Gilman, Esq., Pierce Atwood, LLP, Portland, ME, Richard D. Solman, Esq., Solman & Hunter, P.A., Caribou, ME, for Faustina Fogarty.

Robert G. Bellefleur, Esq. (orally), Madawaska, ME, for Juanita Flanigan.

Harold L. Stewart II, Esq. (orally), Stewart Law Office, P.A., Presque Isle, ME, for Reginald King.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

Majority: CLIFFORD, ALEXANDER, SILVER, MEAD, and GORMAN, JJ.

Dissent: SAUFLEY, C.J., and LEVY, J.

CLIFFORD, J.

[¶ 1] Faustina Fogarty appeals from a judgment of the Aroostook County Probate Court (*Dunleavy, J.*) following a new trial granted by the court on Juanita Flanigan's motion in connection with the probate of the Estate of George L. Fournier, the deceased brother of Fogarty and Flanigan. Fogarty contends that the court erred in granting a new trial, and that the evidence does not support the court's judg-ment following that new trial. We affirm the judgment.

## I. BACKGROUND

[¶ 2] George L. Fournier died on February 7, 2005, in Fort Kent. He had two surviving sisters, Fogarty and Flanigan. In April of 2005, on Fogarty's application, the Probate Court admitted Fournier's will for informal probate and appointed Fogarty as personal representative. Soon after, in May of 2005, Flanigan petitioned the court for formal probate of the will and appointment of herself as personal representative.

[¶ 3] In July of 2005, Fogarty filed a petition for a declaratory judgment, seeking to establish the existence of an oral inter vivos trust in the amount of $400,000 set up by Fournier to benefit only Fogarty. Following a hearing, the court found that although Fournier had entrusted $400,000 to his friends, Josephat and Yvette Madore, with instructions to deliver the sum to Fogarty upon his death, Fournier intended that the money be administered along with his Estate according to his will, and ordered that it be delivered to Fogarty in her capacity as personal representative of his Estate rather than as an individual and the sole beneficiary. The court thus formally admitted the will to probate, removed Fogarty as personal representative, appointed a third party as personal representative, and ordered Fogarty to return the $400,000 to the Estate for distribution among all devisees. Fogarty filed an appeal to this Court.

[¶ 4] By decision dated July 26, 2006, we vacated the Probate Court's decision and remanded the matter for entry of a judgment in favor of Fogarty. *Estate of Fournier (Fournier I)*, 2006 ME 89, ¶ 10, 902 A.2d 852, 855. We concluded that the overwhelming and uncontradicted evidence established that "Fournier intended Fo-

garty to take the money in her individual capacity." *Id.* ¶ 9, 902 A.2d at 854. On September 1, 2006, the Probate Court, in compliance with our mandate, entered a judgment awarding Fogarty the entire $400,000 as the sole beneficiary of the trust created by Fournier.

[¶ 5] Ten days later, on September 11, 2006, Flanigan moved for a new trial, and for relief from the court's judgment, based on the discovery of new evidence. *See* M.R. Civ. P. 59, 60(b)(2). The newly discovered evidence on which Flanigan relied is a memo written by Fournier and signed by Josephat Madore, which was found in Fournier's home in late August of 2006. The memo acknowledged receipt of the $400,000 from Fournier and providing for the money to be distributed to Flanigan, Fogarty, and Curtis Ryan King, Fournier's grandnephew.

[¶ 6] Following a hearing, the court made the following findings as to Flanigan's motion for a new trial, which are supported by competent record evidence. At the time of his death, Fournier owned a one-bedroom home in Fort Kent. The personal representative retained Louis P. Albert and Michael C. Albert, of St. John Valley Realty Co., LLC, to clean up the Fournier home and list it for sale. The Alberts examined all of the items in the house, decided what to keep and what to throw away, and otherwise prepared the house for sale.

[¶ 7] Fournier's house was "full," "very cluttered," and was covered "wall to wall" such that "there wasn't a square foot that wasn't covered with something." It took four people an entire month to go through all of Fournier's belongings, and resulted in a large truck-full of items to be taken to the dump.

[¶ 8] In cleaning up the house, on August 31, 2006, the Alberts discovered the memo among Fournier's papers and ef-

fects. Fournier's bureau was forty to forty-five inches wide, stood five to six inches off the floor, and had a mirror attached at the top. While moving Fournier's bureau away from the wall, the Alberts discovered a small metal cash box that had been tucked under the bureau and "set way back against the wall."

[¶ 9] The metal box contained, among other things, the memo, which was written with both pen and pencil, and stated as follows:

Nov. 10, 1999

Be it remembered and done that I, George L. Fournier transferred to Josephat Madore the sum of $400,000 four hundred thousand dollars for sole purpose of reimburse to Juanita Flanigan, & Faustina Fogarty, and ~~Curtis R. King Jr.~~

Signed: Josephat Madore

Pay back obligation

The court found the memo to be a reliable and adequately authenticated document, and granted Flanigan's motion for a new trial on the issue of the $400,000 trust created by Fournier.

[¶ 10] The court conducted the new trial on October 23, 2007, at which it admitted and considered the memo as newly discovered evidence. The court found that the memo evinced Fournier's intent to create an oral inter vivos trust, with Josephat Madore as trustee, in the amount of $400,000 to be divided equally upon Fournier's death among three beneficiaries: Fogarty, Flanigan, and King. Fogarty filed this appeal.

## II. DISCUSSION

### A. Motion for a New Trial

[¶ 11] Fogarty first contends that the court erred in granting Flanigan's motion for a new trial. The disposition of a

motion for a new trial is reviewed for clear error as to the underlying factual findings, and for an abuse of discretion as to the court's ultimate decision. *State v. Sheldon*, 2000 ME 193, ¶ 7, 760 A.2d 1083, 1085; *see also Estate of McCormick*, 2001 ME 24, ¶ 35, 765 A.2d 552, 564.

■ [¶ 12] Generally, in the interest of judicial economy and the finality of judgments, "[n]ew trials based on newly discovered evidence are disfavored and granted only upon convincing proof." *Hess v. Hess*, 2007 ME 82, ¶ 14, 927 A.2d 391, 395 (quotation marks omitted); *Town of Eliot v. Burton*, 392 A.2d 56, 58 (Me. 1978). It is the moving party's burden to provide such convincing proof. *Wooldridge v. Wooldridge*, 2008 ME 11, ¶ 6, 940 A.2d 1082, 1084. The trial court may grant a motion for a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law or in suits in equity in the courts of this state." [1] M.R. Civ. P. 59(a). One such reason is the ground of newly discovered evidence, which was the basis of Flanigan's motion in this case.[2] In order to prevail on a motion for a new trial on the ground of newly discovered evidence, the moving party must establish five elements:

(a) that the new evidence is such that it will probably change the result upon a new trial, (b) that is has been discovered since the trial, (c) that it could not have been discovered before the trial by the exercise of due diligence, (d) that it is material to the issue, and (e) that it is not merely cumulative or impeaching.

2 Field, McKusick & Wroth, *Maine Civil Practice* § 59.2 at 60–61 (2d ed. 1970) (citing *Harrison v. Wells*, 151 Me. 75, 81, 116 A.2d 134, 137 (1955)).

■ [¶ 13] Fogarty contends that Flanigan failed to establish three of these elements, but apparently does not dispute that (b) and (d), regarding the time of discovery and the materiality of the discovery, have been adequately established. Fogarty primarily argues that Flanigan's "failure to search the home with sufficient vigor" is fatal to her motion for a new trial in that it indicates a lack of the requisite due diligence as a matter of law. Fogarty also contends that the evidentiary value of the memo is merely impeaching, and that it should not change the prior ruling that Fogarty was the sole intended beneficiary of the trust.

■ [¶ 14] In reviewing the court's factual findings with regard to Flanigan's request for a new trial, we note that the weight of evidence and credibility of witnesses are matters exclusively within the province of the fact-finder. *See Estate of Siebert*, 1999 ME 156, ¶ 10, 739 A.2d 365, 368. That there is contrary evidence that would support a different result is not, without more, a basis for vacating the trial court's factual findings. *Preston v. Tracy*, 2008 ME 34, ¶ 10, 942 A.2d 718, 720. Only if there is no competent evidence in the record to support the court's decision, or if the findings of the court are insufficient as a matter of law, will we disturb the Probate Court's grant of a new trial. *Id.*

---

1. Maine Rule of Civil Procedure 59 is applicable to probate proceedings pursuant to M.R. Prob. P. 59.

2. Flanigan moved in the alternative for relief from judgment pursuant to M.R. Civ. P. 60(b)(2) on the ground of "newly discovered evidence." To prevail on a motion for relief from judgment on the ground of newly dis-

covered evidence, the moving party must establish both that the evidence is "newly discovered" and that "the evidence could not have been discovered by due diligence in time to move for a new trial pursuant to M.R. Civ. P. 59(b)." *Estate of McCormick*, 2001 ME 24, ¶ 38, 765 A.2d 552, 565; *see* M.R. Civ. P. 60(b)(2).

[¶ 15] We agree with Fogarty that the due diligence standard is a "stringent" one. *See Burton,* 392 A.2d at 59. We have often affirmed the trial court's determination that so-called "newly discovered evidence" could have been found prior to or during the first trial with the exercise of such diligence; nevertheless, in each of these decisions, including those cited by Fogarty, the moving party was already aware of the existence of the "new" evidence, but either had not been able to locate the evidence in time to present it at the first trial, or had made the tactical decision not to do so. *State v. Cookson,* 2003 ME 136, ¶¶ 30, 33, 837 A.2d 101, 110, 111 (regarding an expert's testimony that the expert later realized was incorrect, as well as "[a] confession by an alternative suspect known to the defense at the time of trial"); *McCormick,* 2001 ME 24, ¶ 39, 765 A.2d at 565 (involving the moving party's failure to adequately depose a key witness in preparation for the first trial); *Sheldon,* 2000 ME 193, ¶¶ 6, 8, 760 A.2d at 1084, 1085 (maintaining that evidence discovered too late as a result of the moving party's failure to complete a full review of town records she knew existed prior to the first trial did not satisfy her duty of due diligence); *State v. Ardolino,* 1999 ME 14, ¶ 11, 723 A.2d 870, 874 (affirming the trial court's denial of a new trial based on a previously existing audio tape that had been enhanced since the first trial); *Webber Oil Co. v. Murray,* 551 A.2d 1371, 1376 (Me.1988) (involving trial counsel's failure to assert all contentions and obtain answers to all discovery during the first trial); *Burton,* 392 A.2d at 59 (regarding the moving party's failure to obtain a complete copy of the State Plumbing Code governing the circumstances in preparation for the first trial).

[¶ 16] The circumstances of this case are quite different. Flanigan failed to discover the memo not *just* because it was hidden and difficult to find in Fournier's "very cluttered" home, although the court did find and credit those facts. Nor was it the result of her failure to utilize proper discovery mechanisms to obtain the memo from some other party. Rather, Flanigan had no reason to suspect that the memo or any document like it, or any such similar evidence, might exist at all. Accordingly, neither Flanigan nor any other interested party had any reason to search for it in Fournier's home or elsewhere. The extreme clutter in Fournier's home, the fact that the memo was hidden under furniture and difficult to locate, the fact that it took two people almost a month to discover the memo, and the fact that Flanigan neither knew that the memo existed nor had any reason to know that the memo existed at all constitute findings of fact, which, because supported by ample evidence in the record, we do not disturb.

[¶ 17] The Probate Court specifically found that the memo would not be merely cumulative or impeaching and that it would probably change the outcome of the case. Although the memo is certainly impeaching to the Madores testimony, it is not *just* impeaching because, the court found, the memo "is clearly material to the issue," and is "powerful direct evidence" of Fournier's intent. We are not persuaded by Fogarty's contention that the memo does not constitute evidence strong enough to change the outcome of the case. The weight and credibility of evidence are for the trial court to determine. *Siebert,* 1999 ME 156, ¶ 10, 739 A.2d at 368. The handwriting, the writing instruments used, and the language used in the memo are facts that go to the weight and credibility of the memo. We discern no error or abuse of discretion in the court's decision granting Flanigan's motion for a new trial.

**B. Judgment Following Second Trial**

[¶ 18] Fogarty further contends that the court's judgment following

the second trial finding an oral inter vivos trust to equally benefit Fogarty, Flanigan, and King is unsupported by sufficient record evidence. Again, the Probate Court's underlying factual findings are reviewed for clear error, and will be upheld if there is any competent record evidence to support them. *McCormick*, 2001 ME 24, ¶ 35, 765 A.2d at 564. The court's application of those facts to its ultimate conclusion is reviewed for an abuse of discretion, however. *Preston*, 2008 ME 34, ¶ 10, 942 A.2d at 720.

[¶ 19]   The Maine Uniform Trust Code, 18–B M.R.S. §§ 101–1104 (2008), sets out the method by which a trust may be created. It provides:

### § 402.   Requirements for creation

**1.   Requirements.**   A trust is created only if:

   **A.**   The settlor has capacity to create a trust;

   **B.**   The settlor indicates an intention to create the trust;

   **C.**   The trust has a definite beneficiary or is:

      (1) A charitable trust;

      (2) A trust for the care of an animal, as provided in section 408; or

      (3) A trust for a noncharitable purpose, as provided in section 409;

   **D.**   The trustee has duties to perform; and

   **E.**   The same person is not the sole trustee and sole beneficiary.

**2.   Definite beneficiary.**   A beneficiary is definite if the beneficiary can be ascertained now or in the future, subject to any applicable rule against perpetuities.

**3.   Power to select beneficiary; failure of power.**   A power in a trustee to select a beneficiary from an indefinite class is valid. If the power is not exercised within a reasonable time, the power fails and the property subject to the power passes to the persons who would have taken the property had the power not been conferred.

18–B M.R.S. § 402. Thus, in the instant matter, it was Flanigan's burden to prove at the second trial that (1) Fournier had the capacity to create a trust, (2) Fournier intended to create a trust, (3) Fournier named one or more definite beneficiaries of the trust, (4) Fournier designated a trustee to perform certain duties, and (5) the trustee was not the sole beneficiary of the trust.

[¶ 20]   There is no dispute that Fournier intended to create a trust in the amount of $400,000 to be held by Josephat Madore, and to be distributed at the time of Fournier's death. Indeed, we confirmed as much in *Fournier I*, 2006 ME 89, ¶ 9, 902 A.2d at 854. Fournier had both the capacity and the intent to create a trust. Thus, there is little dispute that Fournier named Josephat Madore as trustee, that Fournier intended the trustee to distribute the proceeds of the trust upon Fournier's death, and that Josephat was himself not a beneficiary of the trust. Finally, there is no dispute that Fournier named at least one definite beneficiary of the trust, that is, Fogarty. The only true factual dispute is whether Fournier intended others aside from Fogarty to benefit from the trust as well.

█   [¶ 21]   The court found that Fournier had indeed created such an inter vivos trust in the amount of $400,000 to benefit Fogarty, Flanigan, and King equally upon Fournier's death, with Josephat Madore as trustee. The court's findings are based on competent record evidence, including the testimony of a handwriting expert, who confirmed that most of the writing on the memo was the handwriting of Fournier, and that Josephat Madore's

signature was authentic; Flanigan's testimony that Fournier told her that she and Fogarty were both to receive money from the Madores upon Fournier's death; testimony from King's father that Fournier had always taken a special interest in King; and the residuary clause in Fournier's uncontested will, which provided that the residuary of his Estate be distributed to Fogarty, Flanigan, and King.[3] Importantly, the memo itself, as credited by the Probate Court, constitutes strong evidence that Fogarty, Flanigan, and King were the intended beneficiaries of the trust, and that they were to share equally the $400,000 upon Fournier's death.[4]

The entry is:

Judgment affirmed.

LEVY, J., with whom SAUFLEY, C.J., joins, dissenting.

[¶ 22] The standard for establishing due diligence in connection with a motion for a new trial based on newly discovered evidence pursuant to M.R. Civ. P. 59 must be stringent. *See Town of Eliot v. Burton,* 392 A.2d 56, 59 (Me.1978). Anything less

demanding calls into question the finality of the judgments issued by Maine's courts and the ability of the public to make informed decisions in reliance on those judgments. *See id.* at 58. Because I conclude that the majority's application of the due diligence standard to the facts of this case does not apply our stringent standard, I respectfully dissent.

[¶ 23] Faustina Fogarty began the process to probate the will of her deceased brother, George L. Fournier, in April 2005. Beginning in July, she and her sister Juanita Flanigan actively litigated whether Fournier had established an inter vivos trust benefiting only Fogarty. Following a trial, the court entered its initial judgment on November 21, 2005, adopting Flanigan's position. In July 2006, we vacated the judgment on appeal, directing that judgment be entered in favor of Fogarty. *Estate of Fournier,* 2006 ME 89, ¶ 10, 902 A.2d 852, 855. The memorandum that formed the basis for the Probate Court's grant of a new trial was discovered immediately thereafter.

---

**3.** We acknowledge the abundance of evidence supporting alternative findings such that, based on that evidence alone, we concluded in *Fournier I* that the facts overwhelmingly indicated that Fournier intended for Fogarty to take all of the $400,000 in her individual capacity upon his death. That evidence includes the testimony of Josephat Madore stating that Fournier told him to hold the money and give it to Fogarty when Fournier died; that Fogarty needed the money more because she had a family; that Flanigan was already a wealthy woman; and that he did not wish for Flanigan, King, or anyone else to obtain the money. *Estate of Fournier,* 2006 ME 89, ¶ 6, 902 A.2d 852, 853–54. Yvette Madore likewise testified that Fournier requested that the money go to Fogarty alone because she needed it more and because Flanigan was "well off." *Id.* The existence and terms of the memo serve a purpose more than just to impeach the foregoing evidence, although the

memo is nevertheless also *very* impeaching to the Madores' testimony.

**4.** Finally, Fogarty argues that the order of the Probate Court entered following the second trial constitutes merely its improper attempt to revive its original order in favor of Flanigan, in contravention of this Court's order on remand in *Fournier I.* Fogarty is correct that the Probate Court, in its order on the new trial, unnecessarily undertook to "explain its [initial] decision ... since this court does believe that its [initial] decision ... because it was poorly drafted, was misinterpreted by the Law Court." Although the Probate Court did issue a judgment in compliance with our mandate in *Fournier I,* its lengthy attempt to clarify its prior decision was superfluous. Nevertheless, the court properly undertook a new analysis of the evidence based on the new facts presented at the second trial, and its resulting judgment is supported by competent evidence.

[¶ 24] Due diligence is defined as "the diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." *Black's Law Dictionary* 488 (8th ed. 2004). Due diligence "looks not to what the litigant actually discovered, but what he or she *could* have discovered." 12 *Moore's Federal Practice* § 60.42[5] (3d ed. 2007).

[¶ 25] The question of whether Flanigan could have timely discovered the memo by the exercise of due diligence must be determined by Flanigan's actions during the period that preceded the entry of the November 2005 judgment. The Probate Court recognized the same, concluding that good cause existed for it to grant Flanigan a new trial regarding the inter vivos trust because:

> [Flanigan] could not proffer a memo that she did not know existed, that was located in a hideaway in George's cluttered bedroom, in an equally cluttered house, which was under the control of [Flanigan's] adversary, the acting personal representative.

I will address each of these critical findings in reverse order.

[¶ 26] First, although the home was under Fogarty's control in her capacity as the personal representative, Flanigan had the right under the rules of discovery to gain access to the home and examine its contents prior to the trial. She failed to do so. *See Burton,* 392 A.2d at 59 (holding grant of new trial erroneous, in part, because the attempt to obtain a complete copy of the applicable code provisions in advance of trial informally, without using discovery procedures, did not meet the due diligence standard); *see also Estate of McCormick,* 2001 ME 24, ¶ 39, 765 A.2d 552, 565 (finding no due diligence when moving party could have elicited testimony through discovery procedures, but did not). During the trial, Flanigan was offered the opportunity to enter and search the home without Fogarty or her attorney present, and, in fact, did so prior to the entry of the court's judgment. Thus, that the residence was under Fogarty's control is immaterial. Flanigan, in fact, entered the premises prior to entry of the court's judgment in November 2005.[5] *See State v. Sheldon,* 2000 ME 193, ¶ 8, 760 A.2d 1083, 1085 (holding due diligence not exercised to discover accounting errors before end of trial even when defendant had difficulty gaining access to tax records, and once access was gained, found records in complete disarray).

[¶ 27] Second, the court's finding that the bedroom and residence were cluttered is of little consequence regarding due diligence. The realtors who subsequently discovered the box containing the memorandum did so by simply going through the residence room-by-room. The residence was a one-bedroom house. The realtors' discovery of the cash box demonstrates that the clutter was not a significant barrier to finding the box. *See id.*

[¶ 28] Third, the court's finding that the memo was located in a "hideaway" is not supported by the record. The memorandum was found in a small metal cash box that was against the wall, under a bureau in the bedroom. The box was not locked, and though not in plain view, it was not hidden, concealed, or otherwise secreted to any substantial degree. It was simply under a bureau in a cluttered bedroom. That location is not a "hideaway" to the extent that term is intended to describe a

---

5. In addition, even if Fogarty was herself derelict in not conducting a reasonable search of the residence and discovering the memoran- dum, Fogarty's lack of due diligence does not excuse Flanigan's lack of due diligence when she searched the home.

location that is hidden from discovery even after a diligent search (such as under a floor board, behind a wall, or inside a light fixture).

[¶ 29] Fourth, the finding that Flanigan could not proffer a memo that she did not know existed "does not adequately establish that, through the exercise of due diligence, the evidence could not have been discovered in time to raise it at trial." *Spickler v. Dube,* 463 A.2d 739, 740 (Me. 1983). It is certainly reasonable to expect that the potential beneficiary of a trust in the amount of $400,000 would conduct a diligent search for documentation of the trustor's intent regarding the beneficiaries of that trust. Flanigan had the opportunity to discover evidence, both known and unknown, when she examined the contents of the residence. The determinative question for purposes of Rule 59 is whether she could have discovered the memo if she had searched the residence with due diligence. The realtors' discovery of the cash box, more than a year after the completion of the trial, demonstrates that she could have.

[¶ 30] Human behavior being what it is, it is commonly known that people store important personal documents, coin collections, sentimental objects, and other valuables in boxes or containers placed in a closet, on a shelf, or under a bureau or bed. Items stored in this manner may be hidden from view, but they are readily discovered if one performs a diligent search. A party to a formal probate proceeding who is given the opportunity to examine the contents of the decedent's residence, but who fails to look in common storage places for critical documents and other evidence, whether known or unknown, has not been diligent. The due diligence standard demands more than a cursory look.

[¶ 31] Because Flanigan failed in her burden to establish grounds for the extraordinary remedy of a new trial based on newly discovered evidence, the Probate Court acted outside the bounds of its discretion when granting a new trial. We should vacate the judgment and reinstate the prior judgment as directed in our first opinion in this case.